the first time in the county court, on appeal, and the court did not err in sustaining exceptions to it.

When a plea of privilege is filed and relied on as to jurisdiction, the one seeking to avail himself of that plea must give the other party a better writ. He must show exactly where the proper jurisdiction is, so that the venue may be correctly laid. This cause originated in the justice's court of Guadalupe county, from which it was appealed to the county court. In fact the amount involved indicates that the justice's court has exclusive original jurisdiction, and the county court could only acquire jurisdiction on appeal. The plea of privilege does not show in what justice's precinct the appellant lives; but he asks that the case be transferred to the Dallas county court from the county court of Guadalupe county after he has neglected to file any plea in the justice's court. We think it too well settled in Texas that he cannot do this to require us to cite authorities. After appellant failed to file his plea in the justice's court, he voluntarily appealed to the county court of Guadalupe county, the same court which he now says had no jurisdiction. If he had, in due time, filed his plea of privilege in the justice's court, and had not waived same, it follows that he could urge the same plea in the county court. But even then, if the county court should find that the plea should have been sustained had it been filed in the justice's court, the case would go to the proper justice's court in Dallas county, the name of which appellant has failed to furnish. Therefore his contention cannot be sustained, first, because his plea did not show the court that rightfully had jurisdiction, and, second, because he waived the right to such plea by not filing same in the justice's court. Karner v. Ross, 48 Tex. Civ. App. 542, 95 S. W. 46; Hall v. Howell, 56 S. W. 561; Watson v. Baker, 67 Tex. 48, 2 S. W. 375; Floyd v. Gibbs, 34 S. W. 154.

[5] Nor did the court err in sustaining exceptions urged by appellee Freeman to Leventhal's claim for attorney's fees. An allegation that the claim was fraudulently transferred for the purpose of giving jurisdiction to the court where the cause is sued on is not sufficient to enable appellant to recover attorney's fees. And the same would apply to the items of personal expense in attending the trial sued for in the cross-action. Mutual Life Ins. Co. v. Hargus, 99 S. W. 580; Salado College v. Davis, 47 Tex. 131; Strauss v. Dundon, 27 S. W. 503; Tunstall v. Clifton, 49 S. W. 245.

[6] Appellant contends that the deposition of George B. Hollamon should have been suppressed, because his attorney was not permitted to be present, and because Hollamon refreshed his memory in giving same from some kind of paper which he had. It is made to appear that this paper merely had some dates on it, etc. It is not shown that any injury resulted from the fact that appellant's counsel was not present, especially since the other attorneys were not present. In fact it is not shown how any harm was done, or that it would have been different had counsel for appellant been there. The assignments raising this matter are overruled.

[7] Complaint is made that the court erred in refusing to suppress Hollamon's deposition, because appellant had subpœnaed him as a witness, paid him $1, and he refused to attend court. This is not cause for suppressing a deposition. The court, on application would have issued an attachment for Hollamon, and he would then have come. This was not requested; but, instead, the deposition is sought to be quashed.

We have examined the other assignments, and, finding them without merit, overrule them all.

Judgment affirmed.

---

## TEXAS POWER & LIGHT CO. v. BIRD et al.

(Court of Civil Appeals of Texas. Austin. Feb. 4, 1914. Rehearing Denied March 18, 1914.)

1. APPEAL AND ERROR (§ 1066*)—REVIEW—HARMLESS ERROR.

The submission of an issue not raised by the pleadings, where there is evidence as to such issue which might reasonably have influenced the jury, is reversible error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. § 1066.*]

2. MASTER AND SERVANT (§§ 101, 102*)—INJURIES TO SERVANT—DUTY OF MASTER.

It is the duty of an employer, not only to use ordinary care to furnish a reasonably safe place for his employé in which to work, but to use reasonable care to maintain the place of work in such condition.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 174, 178–184, 192; Dec. Dig. §§ 101, 102.*]

3. MASTER AND SERVANT (§ 291*)—INJURIES TO SERVANT—INSTRUCTIONS—APPLICABILITY TO PLEADINGS—"MAINTAIN."

In an action for the wrongful death of a servant, killed by an explosion of steam pipes, the petition, after alleging that the pipes were old, worn, and weakened, averred that the master was negligent in not maintaining the pipes in proper condition, and in failing to repair or replace worn parts, which, in the exercise of proper care, should have been done. *Held* that, as the expression "maintain" means to keep in proper condition, the petition charged that the master was negligent in failing to keep the place of work in proper condition, and hence, as the necessity of repairs could only have been ascertained by inspection, the petition was broad enough to authorize an instruction on the master's negligence in failing to inspect the pipes to ascertain the needed repairs.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1133, 1134, 1136–1146; Dec. Dig. § 291.*

For other definitions, see Words and Phrases, vol. 5, pp. 4277–4281; vol. 8, p. 7712.]

---

**4. APPEAL AND ERROR (§ 882*)—INVITED ERROR—INSTRUCTIONS.**

In an action for the death of a servant, killed by an explosion of steam pipes, where the jury was instructed at the request of defendant that, if there were latent defects in the appliances furnished which were not known, and could not have been discovered by ordinary care, then it was not liable, defendant could not complain of a charge that it was liable if it failed to use ordinary care in making tests to discover defects, even though the charge was without support in the pleadings; it being in explanation of the one requested by defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

**5. TRIAL (§ 194*)—INSTRUCTIONS—WEIGHT OF EVIDENCE.**

A charge, in an action for the death of a servant, killed by an explosion of steam pipes, that, if the pipes were defective, and if the condition could have been discovered by certain tests, and defendant failed to make such tests, and such failure was not the exercise of ordinary care, then defendant was guilty of negligence, was not erroneous as on the weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454; 456–466; Dec. Dig. § 194.*]

**6. EVIDENCE (§ 91*)—BURDEN OF PROOF.**

A party alleging a fact has the burden of proof.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 113; Dec. Dig. § 91.*]

**7. MASTER AND SERVANT (§ 265*)—ACTIONS—BURDEN OF PROOF—CONTRIBUTORY NEGLIGENCE.**

In an action for the wrongful death of a servant, where defendant pleaded contributory negligence, the fact that some of the evidence of contributory negligence was introduced by plaintiffs did not alter the rule casting the burden of proof on defendant; a plaintiff having the burden of proving his freedom from contributory negligence only when the facts pleaded show his contributory negligence, and he alleges others to exonerate him.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908; 955; Dec. Dig. § 265.*]

**8. TRIAL (§ 255*)—INSTRUCTIONS—REQUEST.**

Unless specially requested, the court need not charge the jury to look to the evidence of plaintiffs, as well as defendant, in determining whether the contributory negligence of a deceased servant, for whose death the action is brought, has been established.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

**9. TRIAL (§ 296*)—INSTRUCTIONS—ERROR.**

In an action for the wrongful death of a servant, the failure of the court to charge that, in determining whether deceased was guilty of contributory negligence, the jury should consider the evidence of plaintiffs as well as that of defendant was not error, where the court summarized the acts which defendant claimed showed contributory negligence, and charged that, if deceased was guilty of contributory negligence by reason of such acts, they should find for defendant.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713, 715, 716, 718; Dec. Dig. § 296.*]

**10. WITNESSES (§ 268*)—CROSS-EXAMINATION—SCOPE.**

In an action for the wrongful death of a servant, killed by an explosion of steam pipes, where defendant contended that the pipes were not defective, and plaintiffs claimed that rust spots and sand holes, appearing on the broken edges of the pipes, existed prior to the explosion, it was proper cross-examination of defendant's chief engineer to question him as to what was done with the pipes after the explosion, and his answer, that they were taken in charge by the boiler insurance company, could not be complained of by defendant.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. § 268.*]

**11. APPEAL AND ERROR (§ 1051*)—REVIEW—HARMLESS ERROR.**

In an action for the death of a servant, killed by an explosion of steam pipes, the erroneous admission of evidence that it was the general custom in power plants to examine such pipes was harmless, where defendant proved that it was its custom to inspect such pipes.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4178; Dec. Dig. § 1051.*]

**12. EVIDENCE (§ 539*)—OPINION EVIDENCE—EXPERT TESTIMONY.**

In an action for the death of a servant, killed by an explosion of a "T" joint in a steam pipe, a witness who was not an expert as to the tensile strength of iron was competent to testify, from his observation and experience with such joints, as to the comparative safety of one fastened with bolts and one screwed into the main pipe.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2349–2352; Dec. Dig. § 539.*]

**13. DEATH (§ 57*)—ACTIONS—DAMAGES—ELEMENTS.**

In an action for the wrongful death of a father, where the petition merely alleged the minority of the children, and that deceased used his wages in their support, the jury, in assessing the damages, might take into consideration the value to the children of the father's mental and moral training, although there was no evidence as to the training he was capable of giving or had given.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 74; Dec. Dig. § 57.*]

**14. MASTER AND SERVANT (§§ 286, 288, 289*)—INJURIES TO SERVANT—ACTIONS—EVIDENCE.**

In an action for the wrongful death of a servant, the questions of defendant's negligence and of the servant's freedom from assumption of risk and contributory negligence *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050, 1068–1090, 1092–1132; Dec. Dig. §§ 286, 288, 289.*]

Error to District Court, McLennan County; Tom L. McCullough, Judge.

Action by Mrs. Ruth Bird and others against the Texas Power & Light Company. There was a judgment for plaintiffs, and defendant brings error. Affirmed.

Neff & Taylor, of Waco, for plaintiff in error. R. H. Kingsbury and E. J. Clark, both of Waco, for defendants in error.

### Findings of Fact.

JENKINS, J. On August 21, 1912, and prior thereto, plaintiff in error was engaged in the electric light business in Waco, Tex. George Bird was in its employ as night fireman. There were six boilers in the boiler room. There was a main pipe running across

---

the boiler room, with which each of the boilers was connected by a pipe line, through which the steam from the boilers entered the main pipe, and was carried thence into the engine room. About 7 o'clock p. m. on said date an explosion occurred in the pipe line leading from boiler No. 4, scalding Geo. Bird, from the effects of which he died. Said pipe line was connected with the main line by a "T," which is a pipe in the shape of the letter T, and used to connect three separate pipes. Between the "T" and the main line, and only a few inches from the "T," was an automatic valve, the purpose of which was to regulate the flow of steam from the boiler into the main pipe. When the steam in the boiler reached a pressure greater than in the main pipe, the valve opened and allowed the steam to pass over into the main through the "T," and would close automatically when the pressure was less in the boiler than in the main. There was a screw on the pipe, which, when screwed down, prevented the valve from opening. Oil was used as fuel, and the fire could be started or extinguished by turning the oil on or off. If the valve was working automatically when the temperature of the steam in the boiler reached a sufficiently high point, it pressed through the connecting pipe line into the main line. This was called cutting a boiler in. When the fire was extinguished, and the temperature of the steam in the boiler became less than that in the main, the valve closed. This was called cutting the boiler out. A boiler could also be cut in or out by means of the screw above mentioned. It was the duty of the fireman to cut boilers in and out as they were needed. A greater number of boilers were used at night than in the daytime on account of the electric lights. On the morning before the explosion George Bird, upon leaving, cut boiler No. 4 out by means of the screw. This was done on account of a leak in the pipe which does not appear to have had any connection with the explosion. Boiler No. 4 was fired by the day fireman before Bird returned to work, and was cut out when the steam in the boiler reached 140 pounds. The steam pressure in the main at the time of the explosion was 150 pounds. The steam pressure in boiler No. 4 a few minutes after the explosion was 150 pounds. The explosion occurred a few minutes after Bird returned to work. No one knows where he was or what he was doing at the time of the explosion. He was a competent and experienced fireman. It is uncertain whether or not the fire was extinguished in boiler No. 4 at the time of the explosion. There is no positive evidence as to the cause of the explosion. The evidence might support a finding that it was caused by Bird's turning the steam in from boiler No. 4 suddenly by means of the screw after it had reached a high pressure in the boiler, though we think the preponderance is against this theory. It might have been

caused by the automatic valve failing to work. It might have been caused by water hammer in the main line, occasioned by its not being properly braced, or it might have been caused by inherent defects in the material out of which the "T" was made, causing it to leak into sand pits and rust, and thereby become weak. By saying what "might" have caused the explosion, we mean that there was evidence tending to support each of these theories.

There is no evidence in support of assumed risk or contributory negligence of George Bird, except upon the theory that the explosion was caused by his negligence in cutting in boiler No. 4. This theory was submitted to the jury, and they found against it. The evidence justifies their finding in this regard. The evidence is sufficient to sustain the finding of the jury that the explosion was caused by the negligence of plaintiff in error, and that such negligence was the proximate cause of Bird's death.

There was a verdict and judgment for defendants in error, which apportioned the damages among the wife and children of deceased. No complaint is made as to the amount of the verdict and judgment.

### Opinion.

Plaintiff in error assigns error on a special charge given at the instance of defendants in error as follows: "If you believe from the evidence that the 'T' in question was defective and dangerous in its use, and you further believe that such condition of said 'T' could have been discovered by the use of certain tests, and you also find that the defendant failed to use such tests, and that such failure on the part of the defendant was not the exercise of ordinary care, then you are instructed that the defendant, if you so find, was guilty of negligence."

[1] Plaintiff in error contends that the giving of this charge was error, for the reason that the failure to make tests to ascertain the condition of the machinery was not alleged as a ground of negligence. It is true that the submission of an issue not raised by the pleading, when there is evidence as to such issue which might reasonably have influenced the jury, is reversible error. There was evidence to the effect that the defects, if any, might have been discovered by making certain tests, known as the hammer test and the water test. Neither of these tests were made. This evidence might reasonably have influenced the jury in finding against plaintiff in error on the issue of negligence. It remains only to inquire whether the petition was sufficient, in the absence of a special exception, to raise the issue as to the failure of plaintiff in error to make these tests.

[2, 3] The petition, after alleging that the lines and connections, including the "T," were old, worn, and weakened, averred that plaintiff in error was guilty of negligence

"in not maintaining said lines or piping, and all connections appertaining thereto, in proper condition, and in not repairing or replacing old and worn out parts thereof, * * * which, in the exercise of proper care, * * * should have been done."

It is the duty of an employer, not only to use ordinary care to furnish a reasonably safe place for his employé in which to work as originally furnished, but also to use reasonable care to maintain the same in such condition. This, it is alleged, the plaintiff in error did not do, and, in attempting to make proof of this allegation, it was shown, without objection, that certain tests, known as the hammer test and the water test, would probably have enabled the plaintiff in error to discover the defects, if any, in the "T." To "maintain" means to keep in proper condition; the duty to maintain requires the making of such necessary repairs as were known to be requisite to the safety of employés, or that could have been known to the employer by the exercise of ordinary care. The evidence showed that such ordinary care required inspection; the jury might well have found from the evidence that such inspection, to meet the demands of ordinary care, required the use of the hammer test or the water test, or both. The plaintiff in error evidently understood that the allegation of failure to maintain included the allegation of failure to inspect, as is shown by its answer, wherein it alleges that, "if it failed to use ordinary care in inspecting its machinery, * * * George Bird knew of such failure, and the danger incident thereto."

We are of the opinion that the allegation of failure to maintain the pipe lines and connections in proper condition includes, by fair implication, a failure to make whatever tests were reasonably necessary to ascertain the condition thereof.

[4] We think that it was not error to give the special charge complained of for the further reason that it was in the nature of an explanation of special charge No. 9, given at the request of plaintiff in error, from which we quote as follows: "Now, if you believe from the evidence that there were any defects in the appliances so furnished, and that such defects, if any, were so latent that they could not have been known to the defendant by the exercise of ordinary care, and the defendant did not know thereof, and could not have known thereof by the exercise of such care, the defendant would not be liable for any injury resulting in the death of said George Bird." Whether such defects would have been discovered by ordinary care depended, under the evidence herein, upon whether or not they could have been discovered by the use of the hammer or water tests, or both, and whether the exercise of ordinary care required such tests to be made. The evidence showed that plaintiff in error did nothing to ascertain the existence of such defects, except to make casual visual inspections.

[5] We do not think that this charge is upon the weight of the evidence. It does not indicate the opinion of the court as to whether or not the "T" was defective, nor whether such defect, if any, could have been discovered by the use of the tests referred to, nor whether the failure to make such tests was negligence. All these are left for the jury to decide from the evidence. If the jury found all of these issues in favor of the defendant in error, the negligence of plaintiff in error followed as a matter of law, and the court did not err in so informing the jury. Mill Co. v. Wright, 154 S. W. 1171; Railway Co. v. Hall, 138 S. W. 435; Railway Co. v. Farley, 136 S. W. 98.

[6, 7] The second assignment is upon the following portion of the court's charge: "The burden of proof is upon the defendant to establish by a preponderance of evidence the special matters of defense pleaded by it." The special matters of defense pleaded by plaintiff in error were assumed risk and contributory negligence. The contention of plaintiff in error is that, inasmuch as the evidence of the plaintiff alone raised the issue of assumed risk and contributory negligence, it was error for the court to charge that the burden of proof was upon the defendant. It is a rule of law, to which, accurately speaking, there is no exception, that the burden of proving any fact is upon him who alleges it. The burden of proving the absence of contributory negligence may be upon the plaintiff, though contributory negligence is not pleaded by the defendant. But this is where the plaintiff alleges a state of facts which, if not excused, show in themselves that he is guilty of contributory negligence, and then alleges certain other facts which exonerate him from the charge of contributory negligence. Such a pleading is in the nature of confession and avoidance, and to say that the plaintiff must prove the absence of contributory negligence is saying no more than that the burden is on him to prove his case as he has alleged it.

Again, where contributory negligence is pleaded by the defendant, and the evidence is sufficient to establish such negligence, as a matter of law, it is the duty of the court to instruct the jury to find in favor of such plea, whether the evidence came from the plaintiff or the defendant, or both. But the fact that some of the evidence may have come from the plaintiff does not alter the rule of law that the burden of proving contributory negligence rests upon the defendant. Railway Co. v. Harris, 103 Tex. 426, 427, 128 S. W. 897; Railway Co. v. Shieder, 88 Tex. 160, 30 S. W. 902, 28 L. R. A. 538.

[8, 9] It might become the duty of the court in certain cases to instruct the jury, when specially requested so to do, that they should look to the evidence of the plaintiff, as well as that of the defendant, in deter-

mining the issue of contributory negligence. No such request was made in this case. Nor was there any apparent necessity for such a charge, inasmuch as the jury could not reasonably have come to any other conclusion, if they looked to the whole charge, which it was their duty to do. In other portions of the charge the specific acts of George Bird, which plaintiff in error alleged constituted contributory negligence and assumed risk, and which it is claimed that the evidence of defendants in error tended to establish, were submitted to the jury, and they were told that, if Geo. Bird was guilty of contributory negligence, or assumed the risks by reason of such acts, if any, to find for the plaintiff in error. Railway Co. v. Anglin, 86 S. W. 785; Traction Co. v. Happ, 122 S. W. 613; Railway Co. v. Howard, 96 Tex. 582, 75 S. W. 805.

[10] The third and fourth assignments of error pertain to the following question and answer of F. W. Wonderlich, a witness for plaintiff in error, upon his cross-examination: "Q. What did you do with the 'T' immediately afterwards [meaning immediately after the explosion]?" to which the witness answered, "It was taken in charge by the boiler insurance company." To which question and answer the plaintiff in error objected, and moved the court to exclude said question and answer from the consideration of the jury. Which objection and motion were overruled. In this there was no error. This case is unlike the cases of Levinski v. Cooper, 142 S. W. 959, and Fell v. Kimble, 154 S. W. 1070, wherein it was apparent that the questions were asked for the purpose of getting before the jury the fact that the defendant had indemnity insurance. Here the circumstances rendered the question a proper one. The witness was the chief engineer of plaintiff in error. There was a sharply contested issue as to whether or not certain rust spots, and what was claimed to be sand holes, appearing on a broken edge of the "T" existed prior to the explosion. The witness had testified that he had examined the piece of the "T" exhibited immediately after the explosion, and that the edges at that time were bright and presented no indications of sand holes. Defendants in error had the right to know who had been in possession of the fragments of the "T," in order that they might prove by such person or persons, if they could, that the fragments had been so kept as that they were not likely to rust, or that they were rusty when they came into the possession of such person immediately after the explosion. The question did not call for an answer which would in any wise connect any insurance company with the case. The witness should have named the person to whom he delivered the fragments, instead of the insurance company for which he acted.

Besides, the question being a proper one, it is not probable that the answer influenced the jury adversely to plaintiff in error. Several jurors were examined on the motion for a new trial, and their testimony showed that those of the jury who considered this testimony at all thought it meant that plaintiff in error had insurance on its boilers. Defendants in error were not suing for damages done to the boiler, and such insurance, if, any, would in no wise indemnify plaintiff in error as to any judgment that might be rendered against it herein.

What is here said as to the testimony of the witness Wonderlich applies with greater force to the testimony of the witness Anderson, whose statement that he signed a statement "to the insurance people" was entirely voluntary, and was by the court excluded from the jury. For the reasons stated, the third, fourth, and fifth assignments are overruled.

[11] The seventh assignment of error is as to the admission of the following testimony of the witness Cable: "Q. State whether or not it is customary, in the exercise of proper conduct of a plant of this kind, where there is a high pressure boiler being used, to examine and repair all the parts and connections. A. Certainly, it is the custom." The proposition of plaintiff in error is that whether or not a specific act is negligence cannot be shown by proof of the custom of other parties engaged in a similar business as to such act. Generally speaking, this proposition is correct. Railway Co. v. Evansich, 61 Tex. 3; Norwood v. Insurance Co., 13 Tex. Civ. App. 475, 35 S. W. 717; Railway Co. v. Duncan, 88 Tex. 611, 32 S. W. 878. But the error, if any, was harmless, inasmuch as the plaintiff in error proved that it was *its* custom to examine and repair all parts and connections of its machinery.

[12] There was no error in admitting the testimony of the witness Smitherman as to the comparative safety of a "T" fastened with bolts with one screwed into the main pipe. The witness was not an expert as to the tensile strength of iron; but he based his answer upon his observation and experience with T's of such character, and we take it that his answer was correct, inasmuch as plaintiff in error could easily have shown the contrary, if such was the fact, by experts and others of like experience who testified in this case as to other matters. No attempt was made to contradict the witness Smitherman, who testified that a "T" put on with bolts would give more room for expansion than one screwed into the main.

[13] To our minds, the eighth assignment of error presents a more serious question than any other in the case. It is to the effect that the court erred in instructing the jury that, in assessing the damages in behalf of the minor children, they might take into consideration "the value, if any, to the minor children of the care, mental and moral training, if any, of the deceased, if he had lived." We have been cited to no case directly in point, nor do we know of any.

It is conceded that this is a proper element of damages, if pleaded; the objection urged is that no such element of damages was alleged. The petition alleges the minority of the children, and that the deceased used his wages in the support, "maintenance, and care of his wife and said minor children." The evidence showed that one of the children was nine years of age, and the other seven, that Mrs. Ruth Bird was their stepmother, who had been married to the deceased about six weeks at the time of his death, and that after his death she was unable to support them. The evidence showed that the deceased was a competent fireman, and that he supported his family; but there was no evidence as to the mental or moral training, if any, that he gave or was capable of giving to his children. In Traction Co. v. Dilworth, 94 S. W. 352, the court said: "In suits by minor children for wrongfully causing the death of their father, the damages are not limited to such a sum as the father would probably have contributed to them, for the loss of the care, moral and mental training of their father, which have an appreciable pecuniary value, may be considered in estimating the damages." In Railway Co. v. McVey, 83 S. W. 36, the court said: "The answer of the appellees to appellant's motion for a rehearing tersely and correctly states the rule as follows: 'The father owed to the children the duty of nurture, protection, education, etc, * * * and the legal right to the same entitled them to have it considered as an element of damages.'" Had such damages been alleged, proof that the deceased possessed average mentality, character, and affection for his children would have entitled the children to recover for the loss of the training which the father might have given had he lived, as the law would presume some damage from such loss. Such proof would not have been necessary had the loss of mental and moral training been alleged, for the reason that it should be presumed, in absence of evidence to the contrary, that the average father is valuable to his minor children in this respect. It would not have been susceptible of exact proof by expert testimony, as the jury were as capable of estimating such value as any witness who might have been called to give his opinion on this subject. Hence we believe that it was not necessary to specifically allege that a minor suffered pecuniary loss by reason of being deprived of the mental and moral training of its parent, but that the general allegation of damages, together with the allegation, as in this case, that the deceased father supported and cared for the child, is sufficient.

[14] The ninth assignment of error relates to the refusal of the court to peremptorily instruct a verdict for plaintiff in error. We overrule this assignment, for the reason that the evidence was such as to require the issues of fact, as to whether the death of George Bird was proximately caused by the negligence of the plaintiff in error, without having assumed the risk of being injured, and without having contributed thereto by his own negligence, to be submitted to the jury.

Finding no error in the proceedings of the trial court, its judgment is affirmed.

Affirmed.