Erma Maxine CONLEY, Administratrix of the Estate of Leslie S. Conley, Deceased, Plaintiff,

v.

The DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, a corporation, Defendant and Third-Party Plaintiff,

v.

AMERICAN REFRIGERATOR TRANSIT COMPANY, a New Jersey corporation, Third-Party Defendant and Second Third-Party Plaintiff,

v.

MISSOURI PACIFIC RAILROAD COMPANY, a Missouri corporation, Second Third-Party Defendant.

Civ. A. No. 5988.

United States District Court
D. Colorado.

Nov. 14, 1962.

Wood, Ris & Hames, William K. Ris, Denver, Colo., for American Refrigerator Transit Co., third-party defendant and second third-party plaintiff.

Preston & Altman, Leo S. Altman, Pueblo, Colo., for Missouri Pac. R. Co., second third-party defendant.

ARRAJ, Chief Judge.

This action was originally based upon a claim arising under the F.E.L.A., 45 U.S.C. § 51 et seq., for the death of the plaintiff's husband, a railroad employee who died after receiving a back injury which was caused by a deteriorated section of track in a certain leased industrial railroad yard in Pueblo, Colorado, wherein the decedent was working as a business invitee of the lessee. The issue of negligence was previously tried separately to this Court with a jury, resulting in the assessment of a judgment against the decedent's employer, Denver and Rio Grande Western, hereinafter referred to as D&RG, in the amount of $67,992.63, plus interest and costs. That judgment was subsequently affirmed on appeal; Denver and Rio Grande Western Railroad Company v. Conley, 10 Cir., 1961, 293 F.2d 612.

The matter has now been tried to the Court for its determination of the ultimate responsibility for inspection and repair of defective track in the area where the injury occurred. The original dispute in this phase of the action concerned the employer, D&RG, on whose engine the decedent was injured; the lessor-owner of the yard where the mishap occurred, Missouri Pacific Railroad Company, hereinafter referred to as Missouri Pacific; and finally the lessee that had its car maintenance facilities in the leased yard, American Refrigerator Transit Company, hereinafter referred to as ART. However, D&RG, the third-party plaintiff, has since been absolved from liability for the incident pursuant to an arbitration award rendered against Missouri Pacific in the amount of $68,-543.25, together with interest and costs. Hence, the action in its present posture, is brought to issue on the counterclaim of the second third-party defendant, Missouri Pacific, for indemnification from the second third-party plaintiff, ART.

ART, while not itself a common carrier, is in the business of supplying refrigerator cars to common carriers by means of railroad facilities. Maintenance and repair facilities for ART's cars are enclosed in a yard, located upon Missouri Pacific trackage, which is locked by ART except when either D&RG or Missouri Pacific switch engines transport ART cars over the yard tracks.

ART was in possession of these premises at the time of the decedent's injury by reason of a renewed lease executed by the parties in 1946. Paragraph 12 thereof provides:

"Lessee, at Lessee's cost and responsibility, shall maintain and keep all of the Facilities, *except the tracks,* located on the Premises, * * *." (Emphasis supplied.)

Paragraph 13 continues as follows:

*"Carrier, as agent and at the cost and responsibility of the Lessee, shall maintain the tracks comprised in Facilities* and all of the Facilities located outside of the Premises, such cost to include

\* \* \* \* \* \*

"(f) expense incurred by Carrier for damages, loss, costs and expenses resulting from injury to or death of persons or loss or destruction of property caused in any manner by or in connection with the performance of the work." (Emphasis supplied.)

And finally, Paragraph 15 states:

"Lessee agrees:

\* \* \* \* \* \*

"(d) subject to the provisions of paragraph (c) of this paragraph 15 with reference to liability for damage to property caused by fire, the Lessee assumes the risk of injury to or death of any person in Lessee's employ, or any person who may be upon or in the immediate vicinity of Premises at the instance, license or invitation of the Lessee, or of the Lessee's employes, and, also, the risk of damage to the property of Lessee, Lessee's employes, or of such persons, *unless such injury, death or damage to property shall be due solely to the negligence of the Carrier,* and to indemnify, protect and save harmless the actions growing out of

any such injury or death or damage to property; and in case any such injury or death or damage to property shall arise from joint or concurrent negligence of the Carrier and the Lessee, it shall be borne by them equally." (Emphasis supplied.)

The Court notes initially that liability in this instance is not conferred upon either party by Paragraph 13, subparagraph (f), since the decedent's injury was not "caused in any manner by or in connection with the performance" of maintaining the tracks in the leased yard. Therefore, the crux of the matter under consideration seems to lie in the interpretation which the Court gives to the term "responsibility" as it appears in the initiating clause of Paragraph 13.

ART takes the position that the reference to responsibility in Paragraph 13 was merely made in the context of *financial* responsibility and that the duty to inspect the leased tracks was incidental to the contractual duty to maintain the tracks. Emphasis is placed upon Missouri Pacific's duty to maintain the tracks as it is set forth in Paragraph 13, suggesting that the broad and comprehensive duties contemplated by the term "maintain" should restrict the interpretation given to "responsibility", as it appears in Paragraph 13, to one which anticipates financial responsibility only.

On the other hand, the lessor, Missouri Pacific, contends, first, that failure to perform its contractual duties does not give rise to tort liability. In the alternative, the lessor asserts that even if it may be subject to liability for its negligence under the lease agreement, by virtue of Paragraph 13 thereof it merely acts in the capacity of agent for the lessee, ART, in making needed repairs on the yard tracks, with the latter retaining full responsibility for inspecting the track within the leased premises and notifying Missouri Pacific of any need for repairs. The term "responsibility", as it appears in the lease, is said by Missouri Pacific to have a primary meaning that is synonymous with "liability", indicating that ART is answerable under Paragraph 13 for all legal obligations arising thereunder; "financial responsibility" should merely be a secondary meaning. See 77 C.J.S. Responsibility, p. 320. Furthermore, the lessor argues that Paragraph 15, subsection (d), the indemnification clause, places the burden of proof upon the lessee; thus, in order to overcome the primary meaning of "responsibility", Missouri Pacific seems to suggest that it must be demonstrated that the parties contemplated a duty on the part of Missouri Pacific under the lease to continuously keep the yard tracks in repair, and not to simply engage in repair work only upon notification. Finally, Missouri Pacific indicates that "responsibility", as used in this lease, was meant to encompass more than mere financial responsibility since the term was specifically added to Paragraph 13 of the 1946 lease when, prior thereto, it had not been contained in the earlier ART-Missouri Pacific lease.

The modern rule pertaining to a lessor's liability arising from a covenant to repair is set forth in Section 357 of the Restatement of Torts. See also 78 A. L.R.2d 1238, 1242, 1252; 7 Fletcher, Cyclopedia of Corporations, Section 2999. The editorial comment to the Restatement section indicates that such liability is not contractual, but rather, it is a tort duty based on the fact that the contract gives the lessor ability to make the repairs and control over them. However, this note also points out that unless the contract stipulated that the lessor shall inspect the premises to ascertain the need for repairs, a contract to keep the interior in a safe condition subjects the lessor to liability only if reasonable care is not exercised after the lessee has given notice of a need for the work. Hence, in applying this Restatement rule, it is necessary to determine whether there has been a sufficient showing that the term "maintain" in Paragraph 13 imposes a duty on the part of Missouri Pacific to inspect the trackage in the leased yard.

The lessor refers to Denver Tramway Corporation v. Rumry, 98 Colo. 24, 52

P.2d 396 (1935), as a Colorado decision which suggests that even if the landlord covenants to repair the leased premises, he is not liable for injuries resulting from his failure to repair. It also seems to cite Girardot v. Williams, 102 Colo. 456, 80 P.2d 433 (1938), for the proposition that the Colorado Supreme Court has indicated that it will not require a landlord to inspect leased premises and that he must be notified by the tenant of any need for repairs. The Court's interpretation of these decisions, though, does not justify these conclusions. Their applicability is most doubtful for the reason that in neither case is there a covenant to repair whereby the lessor agreed to maintain a specified condition on the leased premises.

Similarly, Missouri Pacific cites Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1962, 296 F.2d 256, cert. den. 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18, a case wherein the facts closely parallel those in the instant case; again, the rule for which this decision is asserted is that the failure to perform its contractual duty to maintain the leased tracks does not make Missouri Pacific liable for the resulting damages. But Jacksonville Terminal Co. is distinguishable, too, since the lease therein was interpreted to provide for indemnification of the lessor for *all* judgments, including those arising from the lessor's own negligence. Here, of course, Missouri Pacific, under Paragraph 15, subparagraph (d), is liable for its sole negligence.

Since the Court has been unable to discover any Colorado decisions dealing directly with the problem raised herein, it seems probable that the Colorado courts would generally adhere to the Restatement analysis. Thus, in order for the lessee, ART, to avoid liability for the claim under the indemnity clause in Paragraph 15, it must appear that the terms of the contract obligated the lessor, Missouri Pacific, to inspect the trackage in the leased yard.

The basic reasoning which this Court feels constrained to follow in this case is contained in Sanderson v. Berkshire-Hathaway, Inc., 2 Cir., 1957, 245 F.2d 931, wherein an employer-landlord was held liable to its tenants for negligently failing to keep the premises in adequate repair when it was found that the lessor had agreed to maintain them in a safe condition for occupancy. In observing that certain Massachusetts rules had been reasonably applied as Vermont law by the trial court, the Court in Sanderson made the following observation at page 932, of 245 F.2d:

> "In Soulia v. Noyes, supra, (111 Vt. 323, 16 A.2d 173) the court noted that the Massachusetts decisions '*draw a distinction between agreements by the landlord as a part of the letting to make repairs in the lease premises, and express agreements to maintain the premises in a safe condition for occupancy,*' commenting that in the latter case 'it is considered that the landlord has reserved control, and consequently may be held liable.' [1]" (Emphasis and parenthesis supplied.)

And in footnote 1 the Court quoted from Miles v. Janvrin, 196 Mass. 431, 82 N.E. 708, 13 L.R.A.,N.S., 378, as follows:

> " 'To charge a landlord in tort for personal injuries caused by a negligent omission to make needed repairs, not only must the tenant prove that the landlord agreed to keep the premises in repair, but he must go one step further and prove that the landlord agreed to maintain the premises in a safe condition for his (the tenant's) use. That is to say, he must prove that during the term of the lease, so far as their safety is concerned, the premises to be kept in repair are to remain in the control of the landlord (as they would have remained had there been no lease), with nothing but a right in the tenant to use them. * * * There is a difference between a landlord's agreeing to maintain the premises in a safe condition for the

tenant's use and a contract to keep the tenant's premises in repair.' "

At page 933 of 245 F.2d the Court observed:

"As indicated in the language used in Miles v. Janvrin (note 1, supra), the reason behind such a rule is that where the landlord has undertaken to maintain any portion of the premises in a safe condition for occupancy, he is deemed, at least for the purposes of making repairs, to have retained control thereof.[2]"

Referring again to Miles v. Janvrin, supra, in footnote 2, the Court quoted as follows:

" 'If a part of a landlord's undertaking is an agreement in terms to make repairs, and if the circumstances are such as to leave the meaning doubtful, it is to be determined from all the language used and from all the circumstances, whether his meaning is to make repairs merely as a mechanic might contract to make them, only upon notice that they are needed, or whether his undertaking is intended to be broader, including a duty to observe for himself the condition of the premises and provide for their safety.' "

Thus, in applying the criteria set forth in Sanderson and Miles to determine the extent to which Missouri Pacific agreed to keep the leased trackage in repair, the Court has looked to both the provisions of the lease agreement, considered as a whole, and the circumstances surrounding the execution of the instrument.

Turning to the terms of the instrument itself, the Court's attention has been directed to Texas Power & Light Co. v. Bird, Texas Civ.App., 165 S.W. 8 (1914), an action for the death of a servant who was killed by an explosion of steam pipes where, under the circumstances, the word "maintain" was given a broad meaning which corresponded with the duty involved. In discussing the application of the term, the Court, at 165 S.W. 11, said:

"It is the duty of an employer, not only to use ordinary care to furnish a reasonably safe place for his employe in which to work as originally furnished, but also to use reasonable care to maintain the same in such condition. This, it is alleged, the plaintiff in error did not do, and, in attempting to make proof of this allegation, it was shown, without objection, that certain tests, known as the hammer test and the water test, would probably have enabled the plaintiff in error to discover the defects, if any, in the 'T.' *To 'maintain' means to keep in proper condition; the duty to maintain requires the making of such necessary repairs as were known to be requisite to the safety of employes, or that could have been known to the employer by the exercise of ordinary care. The evidence showed that such ordinary care required inspection;* \* \* \* " (Emphasis supplied.)

Although the factual situation in Texas Power & Light Co. v. Bird is not closely parallel to that in the case presently under consideration, we agree with the Texas decision in that, when the circumstances warrant, a duty to inspect may be an incident of the duty to maintain.

Another clause which seems to deserve consideration herein is contained in Paragraph 17 of the lease, and provides:

"Carrier at any reasonable time any day shall have access to Premises for any examination thereof or for making thereto of any repairs by Carrier deemed required."

A similar provision was a significant factor in Alaimo v. Du Pont, 4 Ill.App.2d 85, 123 N.E.2d 583 (1955), an action against a landlord for the death of a tenant's employee incurred as the result of a defective elevator. In considering a "free access" clause in the lease, as well as the nature of the conditions on

the leased premises which the lessor undertook to maintain, the Court, at 123 N.E.2d 586, said:

"Ordinarily the duty of repair would have rested on the lessee. Here the burden of repairing the elevator was laid on the landlord and a right of entry reserved for this purpose. As pointed out in Trego v. Rubovits, 178 Ill.App. 127 at 133, ' * * * dangerous consequences and heavy damages naturally and usually come as a result of not keeping such (elevators) in good condition and repair.' In that case the court found that the covenant which cast the burden of repairing an elevator on the tenant was actually a covenant to keep the elevator in a safe condition. * * * *From the facts before us and the dangerous nature of the elevator, we think that the parties intended the agreement to be a covenant to keep the elevator in a safe or reasonably safe condition.* We conclude therefore that the defendant landlord is liable for the injuries resulting in Alaimo's death if the breach of the covenant was the proximate cause of the accident." (Emphasis supplied.)

With regard to the requirement of notice of the dangerous condition on the leased premises, the Court continued as follows:

"Defendant contends that the lessor's covenant to repair became operative only on notice by the tenant. This is ordinarily so for the usual covenant to repair unless the lease shows an intention that he shall take notice from his own observation, Cromwell v. Allen, 151 Ill.App. 404, 408. There the court said that the intention will not be supplied where the lessor doesn't reserve the right to enter and examine. The plain inference therefore is that where that right is reserved that intention may be found.

"*The instant covenant to repair deals with a hazardous instrumen-tality and the parties must have had reason for giving this burden to the landlord. The covenant does not provide for notice and we think the provision concerning wear and tear does not imply a need for notice. This is not a covenant to repair generally but a covenant to repair covering a specific facility in the building. Under these circumstances since defendant had the right to examine the premises at reasonable times, he or his agent had the obligation to examine the elevator at reasonable periods to determine whether ordinary usage of the elevator had given rise to defects it was his duty to repair.*" (Emphasis supplied.)

See also Dulberger v. Radli, 105 N.J.L. 126, 143 A. 323 (1928).

Similarly, in the instant case the lessor's duty to maintain the track was facilitated by the broad right of access to examine for repairs. This duty, in turn, is specifically related to the general upkeep of the leased trackage. When the purposes for which the premises were leased and occupied are considered, an extremely dangerous condition would exist if the track were permitted to fall into disrepair. In view of these factors, the Court concludes that the terms of the lease agreement justify a construction which places the burden of making inspections of the track on the lessor and which relieves the lessee from the obligation of initially ascertaining the need for repairs and informing the lessor thereof.

In general, the evidence presented herein lends support to the interpretation of the lease agreement outlined above. For instance, it is established that most of the sections of rail in the yard were covered beyond the "web", the narrow portion between the base and the "ball", with dirt and cinder fill, thereby indicating that any inspection for deterioration would involve a substantial maintenance effort. At the same time, while it has been shown that ART often used its own men and equipment to make

"minor repairs" in the tracks when the need for such work was noticed, ART has neither engaged road crews nor employed experts or other personnel experienced in track repair and maintenance.

Furthermore, the record indicates that the parties in fact knew of and contemplated the corporate purposes of ART and the limitations of its personnel and equipment as to track conditions and repairs when they entered into the agreement. Missouri Pacific held in excess of 70 percent of ART capital stock. Most of ART's legal matters, including contracts and leases such as the one in question, were referred to the Missouri Pacific legal department. And at least one officer of ART, its president, was formerly employed by Missouri Pacific. In short, the parties have been described as operating on a "family" basis, a fact which suggests that one has substantial knowledge of the other's operations.

On the other hand, the evidence is conflicting with regard to the procedure followed in causing the leased track to be inspected or substantially repaired. Thus, an interpretation of the lease is unaided by a construction which the parties, by their actions, may have given it. At the same time, the insertion of "responsibility" in Paragraph 13 of the 1946 lease is a fact which the Court finds difficult to construe as being the intention that total responsibility for all conditions in the premises lay in the lessee, since the parties apparently failed to pursue a well defined policy for track inspection and initiating repair work both before and after the execution of the lease agreement until the time of the decedent's injury.

■ Consequently, in the absence of any unequivocal showing that the parties definitely construed the lease agreement as casting the burden of inspection of the track upon one or the other, the Court, in view of both the language in the agreement and the situations of the parties, believes that (a) the duty of Missouri Pacific to maintain the track contemplated such control over the premises for purposes of making repairs that it also included a duty to make a reasonable inspection, and that (b) Missouri Pacific's agreement to maintain the track was a covenant to repair for a specific purpose which, when considered in connection with the lessor's broad right of access, alleviated the necessity for ART's notification to Missouri Pacific of defective conditions in the track. These same considerations lead the Court to conclude that the sole duty to maintain the track lay in Missouri Pacific; and since it was not shown that the decedent's injury was caused by any negligence on the part of ART in making minor repairs, the joint liability provision of Paragraph 15, subsection (d) of the lease is not applicable herein, and Missouri Pacific remains liable for the entire claim.

Finally, unlike Texas Power & Light Co. v. Bird, supra, there has been no evidence presented in this matter which indicates what tests or other means of inspection would be used in the exercise of reasonable care as it relates to the maintenance of railroad track. However, this fact does not prejudice the lessee's position. Since the duty to maintain the leased track included a duty to inspect it, the party acting under this obligation was required to come forth with proof that it had adequately performed. Therefore, it was incumbent upon Missouri Pacific, in order to prevail, to establish by a preponderance of the evidence that it had taken reasonable means to inspect the tracks in a manner commensurate with its duty to maintain. Such a showing was not made, and, as a result, Missouri Pacific will not be relieved of its responsibility under the lease agreement.

Specific Findings of Fact and Conclusions of Law in accordance with this Memorandum Opinion have been concurrently entered and filed herewith.